**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| XY PLANNING NETWORK, LLC; and FORD FINANCIAL SOLUTIONS, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES SECURITIES AND EXCHANGE COMMISSION; and WALTER "JAY" CLAYTON III, in his official capacity as Chairman of the United States Securities and Exchange Commission,<br><br>*Defendants*. | Civil Action No.<br><br>**COMPLAINT** |

**Introduction**

Congress responded to the 2008 financial crisis by passing the Dodd-Frank Act, a sweeping set of financial reforms designed to level the regulatory playing field for firms that provide the same services in the same markets. One of the gaps that the Dodd-Frank Act sought to close concerned the standard of conduct applicable when individuals receive recommendations and advice on how to invest their money in markets. Investment advisers have traditionally been subject to a fiduciary standard, while brokers and dealers have not. Over time, the line between advisers and broker-dealers had blurred, with an increasing number of broker-dealers performing many of the same services as investment advisers, without having to satisfy the same regulatory requirements in doing so.

Dodd-Frank sought to fix this problem. In section 913 of the Act, Congress directed the Securities and Exchange Commission to study the problem and prepare a report with recommendations on how to eliminate the regulatory gap. It authorized the SEC, after having commenced a rulemaking to consider the study, to promulgate rules requiring that

the standards of conduct for providing personalized investment advice "be the same," and that the standard shall be to act in the best interest of the investor "without regard to" the personal interests of the broker, dealer, or investment adviser providing the advice.

At first, the SEC heeded Congress's mandate. Its staff studied the problem and prepared a report recommending the adoption of a universal standard of conduct: the "without regard to" standard. But last year, the SEC broke from Dodd-Frank's requirements—and the recommendations of its own staff—by proposing a rule adopting neither a universal standard nor a "without regard to" standard. Under the SEC's so-called "best interest" rule, the final version of which it promulgated in July 2019, a broker-dealer is permitted to take into account its own personal interests in providing recommendations and advice to investors on how to invest their life savings. This new rule means that broker-dealers may maintain harmful conflicts of interests while being able to market themselves as trusted advisers acting in their client's best interests. The rule thus circumvents a key goal of Dodd-Frank—leveling the playing field—and increases investor confusion.

The plaintiffs bring this suit to challenge the "best interest" rule as unlawful. One plaintiff is a network of registered investment advisers, while the other plaintiff is a member of that network and itself a registered investment adviser. They are injured by the "best interest" rule because it causes them a competitive disadvantage with respect to broker-dealers, makes it more difficult to differentiate their fiduciary standard of conduct from the lower standard of conduct now applicable to broker-dealers, and reduces the incentive for broker-dealers to register as an investment adviser and thus join the network as a member. The plaintiffs seek a declaration that the "best interest" rule exceeds the SEC's statutory authority and is arbitrary, capricious, or otherwise not in accordance with law, in violation of the Administrative Procedure Act. They ask this Court to vacate and set aside the rule.

2

**Jurisdiction and Venue**

1.     This Court has subject-matter jurisdiction over this action under 5 U.S.C. § 702 and 28 U.S.C. § 1331.

2.     Venue is proper under 28 U.S.C. § 1391.

**Parties**

3.     XY Planning Network is an organization of over 1,000 financial planners working under registered investment advisers (or RIAs) that provide financial-planning services on a fee-for-service basis, primarily to Gen X and Gen Y consumers. After five years of rapid growth, XYPN now comprises more than 5% of all state-registered RIAs doing financial planning nationwide.

4.     XYPN provides an array of services to help its members start, grow, and maintain their RIA financial-planning businesses—from registration and compliance services, to technological, business, and consulting services. The organization also hosts conferences and events for the benefit of RIAs. By creating a community of fellow financial planners, the organization further supports RIAs by allowing them to connect with (and learn from) their peers. Thanks in part to these services, financial-planning firms who join XYPN have an annual failure rate of less than 6%.

5.     XYPN requires all members who join to sign a fiduciary oath to act in the best interests of their clients, and to pay an annual fee of approximately $5,000.

6.     Advisers join XYPN in large part for a simple reason: because they are legally required to register as an investment adviser to provide financial-planning services, including investment advice. This means that an adviser who wishes to charge fees for investment advice must seek out compliance services to register their RIA businesses, and will often need technology, coaching, and consulting services to succeed as RIAs. XYPN

provides these services and more, which helps account for its rapid growth. In just five years, the organization now has about as many advisers as a top-30 broker-dealer. And for the last two years, XYPN has been recognized as an Inc. 5000 fastest-growing business.

7. The SEC's "best interest" rule presents a significant threat to XYPN's business and to the businesses of its members. It does so in two primary ways. *First*, XYPN's business model depends in substantial part on financial planners having an incentive to register as RIAs. By failing to impose a standard of conduct for broker-dealers that is the same as the standard for investment advisers, as required by Dodd-Frank section 913(g), the SEC's rule reduces the likelihood that broker-dealers will register as investment advisers, resulting in a loss of business for XYPN. *Second*, the SEC's rule poses a competitive threat to XYPN's members. In subjecting broker-dealers to a lower standard of conduct than RIAs, the rule allows broker-dealers to pursue their own financial interests even when providing the same financial-planning services as RIAs, while also reducing their legal exposure. And the rule does so while using the label "best interests" to refer to the lower standard of care applicable to broker-dealers, making it more difficult for RIAs to differentiate the fiduciary duty they owe—and their own "best interests" standard of conduct—from the duty owed by broker-dealers under the rule. This results in a competitive disadvantage to XYPN's members, who sign a fiduciary oath to act in client's best interests. And this competitive harm in turn injures XYPN by increasing members' risk of failure and thus reducing membership fees.

8. Ford Financial Solutions, LLC is a registered investment adviser that provides financial-planning services on a fee-for service basis. It is located at 33 West 60th Street, New York, NY 10023, and is therefore a resident of this district. Ford Financial

Solutions has operated as an RIA for over three years and serves approximately 80 clients in and around New York every year.

9. Julie Ford, the owner and principal of Ford Financial Solutions, is a member of XYPN and has been for over three years. As part of this membership, she has signed a fiduciary-duty oath to act in her clients' best interests. As a member of XYPN, she pays XYPN an annual fee of approximately $5,000.

10. Ford believes that the SEC's "best interest" rule will allow broker-dealers to have an unfair competitive advantage in attracting new clients that she would otherwise serve. Specifically, Ford is concerned that, under the new rule, consumers will not be able to effectively differentiate the duty that she owes clients from the lower duty broker-dealers owe clients, which will harm her ability to attract new customers. Ford is also concerned that, under the new rule, broker-dealers will be able to provide the same advice that she does while having a lower level of responsibility to clients, fewer regulatory obligations, and thus less legal exposure.

11. The Securities and Exchange Commission is an agency of the United States. It promulgated the rule challenged in this case and is responsible for enforcing it. Walter "Jay" Clayton III is the SEC's Chairman. He is sued in his official capacity.

**Factual Allegations**

**A. The disparate regulatory regimes for investment advisers and broker-dealers**

12. Today, investment advisers and broker-dealers are both in the business of helping people manage their money, invest their savings, and plan for their financial futures. But there have long been "[d]ifferences in the regulation of broker-dealers and investment advisers [as] a consequence of the historically different functions and activities

5

of investment advisers and broker-dealers and different governing statutes." SEC, *Study on Investment Advisers & Broker-Dealers* 104 (Jan. 2011) ("Section 913 Study").

13. Investment advisers are fiduciaries for their clients. They "provide a wide range of investment advisory services and play an important role in helping individuals and institutions make significant financial decisions." *Id.* at 6. Because of the importance of these services, investment advisers are regulated by federal and state law, which requires them to register and comply with a host of other obligations. More than 15,000 investment advisers are registered at the state level, while over 11,000 are registered with the SEC. *Id.* Many of these state-registered RIAs, as mentioned above, are members of XYPN.

14. "Like investment advisers, broker-dealers provide services that play an important role in helping retail and institutional investors make significant financial decisions." *Id.* at 8. Traditionally, they have served as "intermediaries" for investors, offering arm's-length sales recommendations as a broker (*i.e.*, "one who acts as an agent for someone else"), a dealer (*i.e.*, "one who acts as principal for its own account"), or both. *Id.* at 9. Unlike investment advisers, broker-dealers have not historically been subject to a fiduciary standard and are not required to register as investment advisers to perform brokerage or dealer services.

15. Given these different regulatory regimes, many broker-dealers have, over time, increasingly sought to provide investment advice to clients without having to become RIAs. They have sought, in other words, to reap the benefits of functioning as an investment adviser without incurring any of the regulatory burdens of being designated as one. In particular, because the standard of conduct for broker-dealers has been lower than the standard for investment advisers—allowing broker-dealers to pursue their own financial

6

gain when making recommendations to investors—brokers have a powerful incentive to avoid registering as investment advisers and being treated as such for regulatory purposes.

16. This means that the traditional line between broker-dealers and investment advisers has broken down in practice, benefiting brokers to the detriment of investors and investment advisers. Among other things, the regulatory disparity between investment advisers and broker-dealers, and the increasingly blurry functional line between them, has undermined the "essential purpose" of a key Depression-era statute, the Investment Advisers Act of 1940: "to protect the public from the frauds and misrepresentations of unscrupulous tipsters and touts and to safeguard the honest investment adviser against the stigma of the activities of these individuals." H.R. Rep. No. 76-2639, at 28 (1940).

**B. The Dodd-Frank Act**

17. Eventually, Congress stepped in. In 2010, after another financial crisis, Congress passed a sweeping set of financial reforms known as the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010).

18. A key issue in the hearings leading up to the passage of Dodd-Frank was "the inconsistent regulatory regimes that exist[ed]" in different financial markets, including the market "for investment advisors and broker dealers." *Enhancing Investor Protection and the Regulation of Securities Markets: Hearing Before the S. Comm. on Banking, Housing, and Urban Affairs*, 111th Cong. 12 (2009) (prepared statement of John. C. Coffee, Jr.). Dodd-Frank's supporters emphasized the need to close existing "regulatory gap[s]" to prevent bad actors from "just reorganiz[ing] to fit into an exemption." *Oversight of the U.S. Securities and Exchange Commission: Evaluating Present Reforms and Future Challenges: Hearing Before the Subcomm. on Capital Markets, Insurance, and Government Sponsored Enterprises of the H. Comm. on Financial Services*, 111th Cong. 12 (2010); *see also* 143 Cong. Rec. S5881 (daily ed. July 15, 2010) (statement of Sen.

Hutchinson) (emphasizing that Dodd-Frank was intended to "make sure the huge gaps that existed that allowed systemic regulatory arbitrage could no longer take place"); *id.* at S5888 (statement of Sen. Johnson) (identifying "gaps in regulation" as a cause of the crisis, because "rules that applied to some financial companies but not all opened loopholes that bad actors could exploit"). In Dodd-Frank, Congress sought to level the playing field and close loopholes across markets.

19. As part of this goal, Congress sought to fill the gap between investment advisers and broker-dealers. Dodd-Frank supporters wanted to "ensure that all investment professionals that offer personalized investment advice have a fiduciary duty imposed on them" to prevent brokers from "push[ing] higher commission products that may be inappropriate for a particular client." 143 Cong. Rec. S5870 (statement of Sen. Akaka).

20. Both the House and Senate included provisions in their proposed bills designed to unify the standards governing broker-dealers and investment advisers in light of the increasingly similar services they provided. *See* Michael V. Seitzinger, Congressional Research Serv., *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Standards of Conduct of Brokers, Dealers, and Investment Advisers* 5 (Aug. 19, 2010) (pointing to "the increase of discretionary accounts in which a broker-dealer has at least some control over the buying and selling of securities without always informing the client of each action," and "other kinds of accounts that broker-dealers have come to offer in addition to the transaction-based account, such as fee-based accounts," as examples of the "blurring" distinction between broker-dealers and investment advisers). In the House bill, the same standard of care would apply to both broker-dealers and investment advisers. *Id.* (citing H.R. 4173, § 7103). In the Senate bill, the SEC was ordered to conduct a study to determine the

8

effectiveness of the existing standards for broker-dealers and advisers and then make rules "concerning any gaps or overlaps found by the study." *Id.*

21. Section 913 of the Dodd-Frank Act "forged a kind of compromise" between the House and Senate bills by ordering the SEC to conduct a study and giving it rulemaking authority only to harmonize the standard applicable to broker-dealers and investment advisers. *Id.* Section 913 consists of eight subsections, each of which builds off the previous subsection. *See* Pub. L. No. 111-203, § 913, 124 Stat. 1376, 1824–30 (July 21, 2010).

22. Subsection (a) defines the term "retail customer." *Id.* at 1824.

23. Subsection (b) directs the SEC to "conduct a study to evaluate" the "existing legal or regulatory standards of care for brokers, dealers, [and] investment advisers" when "providing personalized investment advice and recommendations about securities to retail customers," and to assess "whether there are legal or regulatory gaps, shortcomings, or overlaps" in those standards. *Id.* at 1824–25.

24. Subsection (c) contains a list of fourteen items that the SEC must consider in conducting the study. *Id.* at 1825–27.

25. Subsection (d) requires the SEC to "submit a report on the study" to Congress describing the agency's findings and proposing recommendations for eliminating any "legal or regulatory gaps, shortcomings, or overlaps." *Id.* at 1827.

26. Subsection (e) requires the SEC to "seek public input, comments, and data in order to prepare the report." *Id.*

27. Subsection (f) authorizes the SEC to "commence a rulemaking" in light of the study and report "to address the legal or regulatory standards of care for brokers, dealers, [and] investment advisers," and requires that the agency "consider the findings conclusions, and recommendations of the study." *Id.* at 1827–28.

28. Subsection (g) then grants the SEC specific authority, after commencing a rulemaking, to "promulgate rules" concerning "the standard of conduct" for broker-dealers and investment advisers. *Id.* at 1828. It contains two important parts.

29. The first part, subsection (g)(1), authorizes the SEC to "promulgate rules to provide that, with respect to a broker or dealer, when providing personalized investment advice about securities to a retail customer . . . , the standard of conduct for such broker or dealer with respect to such customer shall be the same as the standard of conduct applicable to an investment adviser under section 211 of the [Advisers Act]." *Id.* (codified at 15 U.S.C. § 78o(k)(1)).

30. The second part, (g)(2), authorizes the SEC to "promulgate rules to provide that the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customers . . . , shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice." *Id.* (codified at 15 U.S.C. § 80b-11(g)(1)). It further provides that "[s]uch rules shall provide that such standard of conduct shall be no less stringent than the standard applicable to investment advisers under section 206(1) and (2) of [the Advisers Act] when providing personalized investment advice about securities." *Id.* at 1829.

31. Finally, subsection (h) turns to enforcement. It harmonizes enforcement by granting the SEC the same authority "with respect to violations of the standard of conduct applicable to a broker or dealer" as it has "with respect to violations of the standard of conduct applicable to an investment adviser." *Id.* at 1829–30.

## C.     The SEC's section 913 study

32.     The SEC's staff conducted the study required by Dodd-Frank and published its report in January 2011 after receiving over 3,500 comment letters. *See* Section 913 Study at ii. Both the study and the comments demonstrated that there was substantial "confusion by retail investors regarding the roles, titles, and legal obligations of investment advisers and broker-dealers." *Id.* at v. The report's recommendations were "designed to address investor confusion and provide for a stronger and more consistent regulatory regime for broker-dealers and investment advisers providing personalized investment advice about securities to retail investors." *Id.*

33.     "Consistent with Congress's grant of authority in Section 913," the report recommended that the SEC "engage in rulemaking specifying a uniform fiduciary standard of conduct that is no less stringent than currently applied to investment advisers under Advisers Act Sections 206(1) and (2) that would apply to broker-dealers and investment advisers when they provide personalized investment advice about securities to retail customers," as contemplated by subsection (g)(2). Section 913 Study at v, 101. The report further recommended, as contemplated by subsection (g)(1), that "the standard of conduct for all brokers, dealers, and investment advisers, when providing personalized investment advice about securities to retail customer . . . , shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice." *Id.* at vi. The report called on the agency to harmonize the regulatory protections "to the extent that harmonization appears likely to add meaningful investor protection." *Id.* at 104.

34.     The report determined that these recommendations, if implemented, would benefit investors. As for the costs, the staff understood that imposing the uniform standard

11

of conduct contemplated by section 913(g) would, among other things, create an incentive for broker-dealers to register as investment advisers (or conversely put, reduce the *disincentive* they'd have to *avoid* registering). The report acknowledged the likelihood that "[b]roker-dealers might deregister and register as investment advisers and, in the process, convert their brokerage accounts into advisory accounts (subject to advisory fees)." *Id.* at 158; *see also id.* at 162 (recognizing that broker-dealers might "respond to a new standard by choosing from among a range of business models, such as converting brokerage accounts to advisory accounts, or converting them from commission-based to fee-based accounts").

### D. The SEC's "best interest" rule

35. Seven years later, in 2018, the SEC proposed a rule rejecting the approach recommended by the study in favor of preserving the regulatory gap that Congress intended to close. Notice of Proposed Rulemaking, *Regulation Best Interest*, 83 Fed. Reg. 21,574 (May 9, 2018). Despite Congress's requirement that it do so, the proposed rule did not adopt a uniform fiduciary standard for broker-dealers and investment advisers. *Id.* at 21,575. Nor did it adopt the study's recommendation that broker-dealers "act in the best interest of the customer without regard to" their own interests—instead requiring only that broker-dealers "act in the best interest of the retail customer at the time the recommendation is made without placing the financial or other interest of the broker-dealer . . . ahead of the interest of the retail customer." *Id.*

36. During the public comment period, XYPN co-founder Michael Kitces submitted a comment opposing the rule's adoption. Echoing the concerns identified in the study, Kitces explained that the proposed rule would mislead consumers who do not understand the difference between broker-dealers and investment advisers or the disparate standards governing their conduct. Kitces further explained that this harm was exacerbated

because the SEC was also operating under a misunderstanding of the Advisers Act: Except for the narrow category of advice "solely incidental" to the provision of brokerage services, broker-dealers are supposed to register as investment advisers before they give advice to retail investors, which triggers a fiduciary-duty standard. Thus, any broker-dealer who wanted to give even episodic investment advice to clients would have to register as an investment adviser and be subject to a fiduciary duty.

37. In July 2019, the SEC promulgated a final rule that adhered in significant respect to the proposed rule. *See Regulation Best Interest: The Broker-Dealer Standard of Conduct*, 84 Fed. Reg. 33,318 (July 12, 2019). The final rule sets forth "the standard of conduct for [a] broker or dealer" "when providing personalized investment advice about securities to a retail customer," but it does not provide that the standard "shall be the same as the standard of conduct applicable to an investment adviser under section 211 of the Investment Advisers Act of 1940," as required by Dodd-Frank section 913(g)(1). Nor does the rule provide that the standard for broker-dealers "shall be to act in the best interest of the customer without regard to the financial or other interest" of the broker-dealer, as required by section 913(g)(2).

38. To the contrary, the final rule maintains a different standard of conduct for broker-dealers and investment advisers. And it expressly rejects the "without regard to" language in favor of a different standard entirely: that a broker-dealer, "when making a recommendation of any securities transaction or investment strategy involving securities (including account recommendations) to a retail customer, shall act in the best interest of the retail customer at the time the recommendation is made, without placing the financial or other interest of the [broker or dealer] ahead of the interest of the retail customer." 84 Fed. Reg. at 33,491 (to be codified at 17 C.F.R. § 240.15l-1(a)(1)); *see id.* at 33,331–32

13

(declining to adopt section 913(g)(2)'s "without regard to" standard). Under this new standard—the key parts of which the agency leaves largely undefined—broker-dealers are permitted to take into account their own interest in making investment recommendations.

39. Because the agency declined to comply with section 913(g)'s requirements, it expressly disavowed any reliance on that provision for its authority in promulgating the rule. *Id.* at 33,330–32. Instead, it took the position that Congress gave it the authority to disregard subsection (g)'s strictures by enacting subsection (f)—even though that provision speaks only of "commenc[ing] a rulemaking," not promulgating a rule (as subsection (g) does), and even though such an interpretation would render subsection (g) superfluous. *Id.* at 33,330, 33,491.

40. In addition, the rule does not adequately explain why it rejected the expert recommendations contained in the section 913 study in favor of an amorphous standard. The SEC says that it departed from the "without regard to" standard recommended by its staff—and required by Dodd-Frank subsection (g)(2)—based on a concern that this language "would be inappropriately construed." *Id.* at 33,332. But, at the same time, the agency expressly acknowledged that any misinterpretation would be unreasonable, and then substituted in its place an unclear standard of its own. *Id.* at 33,331–32 & n.128; *see also* 83 Fed. Reg. at 21,586 (notice of proposed rulemaking). The final rule also contravenes the evidence in the administrative record, which showed that the rule fails to protect investors to the degree contemplated by Dodd-Frank and will only perpetuate investor confusion, not eliminate it. And the SEC's cost-benefit analysis fails to take full account of the costs imposed by its ambiguous "best interest" standard to both investors and industry.

41. The harmful consequences imposed by the rule, moreover, are exacerbated because of a parallel interpretation issued by the agency on the same day as the rule. *See*

14

*Commission Interpretation Regarding the Solely Incidental Prong of the Broker-Dealer Exclusion From the Definition of Investment Adviser*, 84 Fed. Reg. 33,681 (July 12, 2019) (to be codified at 17 C.F.R. pt. 276). That interpretation takes an impermissibly broad view of a statutory exception to the definition of "investment adviser." Section 202(a)(11)(C) of the Advisers Act (codified at 15 U.S.C. § 80b-2(a)(11)) excludes from that definition—and thus excuses from the fiduciary standard and registration requirement—a broker or dealer "whose performance of [] advisory services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation" for those services (known as the "broker-dealer exclusion"). The SEC interpreted the broker-dealer exclusion beyond what the plain statutory text allows, taking the position that the "solely incidental" requirement is satisfied so long as a broker-dealer's investment "advice is provided in connection with and is reasonably related to the broker-dealer's primary business of effecting securities transactions." 84 Fed. Reg. at 33,685. In adopting this view, the agency was in effect resurrecting the same interpretation that the D.C. Circuit previously invalidated as impermissible in *Financial Planning Ass'n v. S.E.C.*, 482 F.3d 481 (D.C. Cir. 2007). The upshot is that the SEC's "best interest" rule has much broader effect than it otherwise would.

## Claims for Relief

### Claim One: Action in excess of statutory authority (5 U.S.C. § 706(2)(C))

42. Section 913(g) of the Dodd-Frank Act is the sole statutory provision that gives the SEC authority to promulgate rules setting forth "the standard of conduct" for broker-dealers "when providing personalized investment advice about securities to retail customers." By expressly disavowing reliance on this provision in its final rule—in a blatant attempt to circumvent section 913(g)'s specific directives—the SEC has acted "in excess of

15

statutory jurisdiction, authority or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The rule is therefore unlawful under the APA.

### Claim Two: Action "not in accordance with law" (5 U.S.C. § 706(2)(A))

43. The rule violates the APA for a second reason: it is "not in accordance with law," *id.* § 706(2)(A)—specifically, Dodd-Frank section 913(g). Section 913(g)(1) provides that, for any SEC rule establishing "the standard of conduct for [a] broker or dealer" "when providing personalized investment advice about securities to a retail customer," the standard "shall be the same as the standard of conduct applicable to an investment adviser under section 211 of the Investment Advisers Act of 1940." The final rule fails this statutory requirement. The standard of conduct it sets forth for broker-dealers is less than—not "the same as"—the standard for investment advisers.

44. Likewise, the final rule is "not in accordance" with section 913(g)(2). That section provides that, for any SEC rule establishing "the standard of conduct" for broker-dealers "providing personalized investment advice about securities to retail customers," the standard "shall be to act in the best interest of the customer without regard to the financial or other interest of the broker, dealer, or investment adviser providing the advice." The final rule, however, explicitly declined to adopt this statutorily mandated "without regard to" standard. It instead adopted what the agency acknowledged was a different standard, allowing broker-dealers to act in their own interests (financial and otherwise) so long as they do not place those interests "ahead of the interest of the retail customer." That standard was not contemplated by Congress and violates section 913(g)(2)'s express requirements.

### Claim Three: Arbitrary or capricious agency action (5 U.S.C. § 706(2)(A))

45. The final rule also violates the APA because it is arbitrary and capricious. 5 U.S.C. § 706(2)(A). The SEC's decision is contrary to the evidence before the agency and

16

congressional intent. It overlooks or disregards material facts and evidence, and relies on factors that Congress did not want it to consider. And the agency's cost-benefit analysis is deeply flawed: Many of the purported benefits lack an evidentiary foundation, while the true costs of the agency's regulation were not adequately considered.

46. Finally, the rule is inconsistent with the Advisers Act, which exempts broker-dealers from the fiduciary standard and registration requirement imposed on investment advisers only if the broker-dealer gives advice that is "solely incidental to the conduct of his business as a broker or dealer." 15 U.S.C. § 80b. The final rule suggests that the critical difference between broker-dealers and investment advisers is about the duration of advice, emphasizing that investment advisers and clients share a "generally ongoing" relationship, while "the provision of recommendations in a broker-dealer relationship is generally transactional and episodic." 84 Fed. Reg. 33,331. By focusing on the episodic nature of the advice and not whether the advice is "solely incidental" to the provision of brokerage services, the final rule is inconsistent with the Investment Advisers Act.

**Request for Relief**

The plaintiffs request that the Court:

A. Declare that the final rule violates the APA because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

B. Declare that the final rule violates the APA because it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

C. Vacate and set aside the final rule and enjoin its enforcement;

D. Award the plaintiffs their reasonable costs, expenses, and attorneys' fees; and

E.	Grant the plaintiffs all other appropriate relief.

September 10, 2019	Respectfully submitted,

*/s/ Jonathan E. Taylor*
Deepak Gupta\*
Jonathan E. Taylor
Alexandria Twinem\*\*
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741

\* *pro hac vice forthcoming*
\*\* *application for admission forthcoming*

*Counsel for Plaintiffs*
